**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| YVETTE CRUZ, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 09-0508 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**Memorandum**

YOHN, J.                                                                September __, 2010

Plaintiff, Yvette Cruz, appeals the denial of her claim for Social Security Supplemental

Security Income ("SSI") by the Commissioner of Social Security ("the Commissioner"). She

seeks judicial review under 42 U.S.C. § 1383(c)(3) (2006), which incorporates 42 U.S.C.

§ 405(g) by reference. I referred the matter to Magistrate Judge David R. Strawbridge , who

submitted a Report and Recommendation ("R&R") recommending that I affirm the

Commissioner's decision. Plaintiff filed objections to the R&R. Plaintiff argues in her objections

that the Administrative Law Judge's ("ALJ's") determination lacked substantial evidence to

support it because (1) the ALJ posed an improper hypothetical question to the vocational expert

("VE") by failing to specify how often plaintiff was required to alternate between sitting and

standing, and (2) the ALJ lacked substantial evidence to support his rejection of the opinions of

plaintiff's mental-health treatment providers with respect to her global level of functioning.

I conclude that the ALJ's hypothetical to the VE was proper because at least some of the

jobs the VE identified would permit plaintiff to sit or stand at will. I also conclude that there was

substantial evidence to support the ALJ's rejection of the opinions of plaintiff's mental-health

treatment providers. I will therefore approve and adopt the R&R and affirm the ALJ's decision.

## I. Factual and Procedural History

Plaintiff was forty-two years old at the time of the application giving rise to this appeal. She has a tenth-grade education and a "limited work history comprised of jobs maintained for relatively short periods of time" and has not engaged in any substantial gainful activity since August 31, 2003, her alleged date of disability onset. (ALJ Dec. 3.)

Plaintiff currently lives with her niece, nine years old at the time of plaintiff's first SSI application and thirteen years old at the time of the most recent hearing, whom she has raised since birth. (*See* R. 698-701, 241 (hearing testimony).)[1] Plaintiff's niece currently receives SSI payments as a result of a psychiatric impairment. (ALJ Dec. 6; R. 701 (hearing testimony).)

### A. Psychiatric History

Plaintiff has been diagnosed with major depressive disorder ("MDD") with psychotic features, borderline personality disorder ("BPD"), and post-traumatic stress disorder ("PTSD") resulting from multiple experiences of sexual abuse during her childhood. She has received mental-health treatment since 2003 at the Crozer-Chester Medical Center/Community Behavioral Health Services ("Crozer CBHS"), where she sees both a psychotherapist and a psychiatrist.

At intake at Crozer CBHS, plaintiff reported that she was molested by her stepfather from the age of eighteen months to five years. She was also molested by her mother's stepsister at age eight and by the uncle of a friend at age thirteen. (R. 121.) She reported suffering from flashbacks of this abuse (R. 122, 128) and from "blackouts" (R. 129). Plaintiff also reported physical abuse by an ex-husband. (R. 126; *see also* R. 512 (treatment note).)

---

[1] Plaintiff also lived with a boyfriend for some portion of the time that her application has been pending. (R. 317.)

During the course of her treatment at Crozer CBHS from 2003 to 2007, plaintiff received individual psychotherapy with a licensed clinical social worker once or twice per week.[2] (R. 445-548, 661-82 (treatment notes).) She also has seen a psychiatrist on a monthly basis, who has prescribed a variety of psychotropic medications, including Remeron,[3] Seroquel,[4] Trazodone,[5] Wellbutrin XL,[6] Effexor XR,[7] Paxil,[8] Abilify,[9] and Klonopin.[10] (*Id.*; R. 567-73, 686-

_____

[2] Plaintiff testified on April 30, 2008, that she was still seeing her treatment providers at Crozer CBHS but no treatment documentation from 2008 is in the record. (R. 702 (hearing testimony).)

[3] Remeron is indicated for the treatment of MDD. *Physicians' Desk Reference* ("*PDR*") 2924 (63d ed. 2009). At times, plaintiff was prescribed the maximum recommended dose. (R. 571-73, 556.) *See PDR* at 2927.

[4] Seroquel is an antipsychotic medication that is indicated for the treatment of schizophrenia and bipolar disorder. *See Seroquel Highlights & Prescribing Information* 2 (2010), *available at* http://www1.astrazeneca-us.com/pi/Seroquel.pdf. Plaintiff began taking Seroquel in April 2004 (R. 573) and progressed to 500 mg by October 2006. (R. 570.) The recommended target dose is 400 mg. *See Seroquel Highlights & Prescribing Information* at 2.

[5] Trazodone is indicated for the treatment of MDD. *See* Nat'l Insts. of Health, *Trazodone*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html. Plaintiff was prescribed Trazodone only once, on February 26, 2004. (R. 573.)

[6] Wellbutrin XL is indicated for the treatment of MDD. *PDR* at 1660. Plaintiff took 150 mg per day, the standard initial dose, between May 2005 and October 2005. (R. 572.) *See PDR* at 1665.

[7] Effexor XR is indicated for the treatment of MDD. *PDR* at 3196. Plaintiff was prescribed Effexor XR only once at the starting dose, on July 31, 2003, before it was apparently discontinued. (R. 573.) *See PDR* at 3203.

[8] Paxil is indicated for the treatment of MDD, PTSD, and other anxiety-related disorders. *See PDR* at 1536-37. Plaintiff began taking 10 mg of Paxil per day (a very low dose) in April 2006 and increased to 40 mg per day by September 2007. (R. 559, 680.) The maximum recommended dose for MDD and PTSD is 50 mg per day. *See PDR* at 1543.

[9] Abilify is an antipsychotic medication indicated for the acute treatment of MDD where the patient has shown an inadequate response to prior antidepressant therapy as well as for the treatment of schizophrenia and bipolar disorder. *See PDR* at 882, 891. Plaintiff began taking 5 mg per day of Abilify in November 2007 and has continued at that dose until the most recent date for which the court has treatment records. (R. 680.) This is the maximum starting dose for

87 (medication logs).) As of February 15, 2008, plaintiff was taking a low dose of Remeron, Klonopin, and Abilify, a high dose of Paxil, and a very high dose of Seroquel. (R. 686.) Plaintiff also attended group therapy at some point during her treatment. (R. 476.) Although one treatment note states that plaintiff was considering hospitalization if she could arrange for child care during that time (R. 446), there is no indication in the record that plaintiff was ever hospitalized for her psychiatric condition or that she required a highly structured or supportive residential environment such as a halfway house or group home. (ALJ Dec. 6.)

Plaintiff's treatment providers at Crozer CBHS consistently assigned plaintiff Global Assessment of Functioning ("GAF") scores of 45-50 beginning June 6, 2003, after a psychiatric assessment given to new patients. (R. 121-29)A GAF score of 45-50 reflects "serious" symptoms, such as suicidal ideation or severe obsessional rituals, or "serious" functional impairments, such as inability to maintain friendships or inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("*DSM-IV*") 34 (4th ed. 1994).[11] After

---

patients with MDD who are already taking an antidepressant but at the low end of the dosage range overall. *See PDR* at 883.

[10] Klonopin is indicated for the treatment of seizure disorders and panic disorders. *See PDR* at 2639. Plaintiff began taking a low dose (0.5 mg) of Klonopin in 2006 (R. 570) and continued at that dose until February 2008, which is the most recent date for which the court has treatment records (R. 686). The recommended target dose is 1 mg perday and the maximum is 4 mg per day. *See PDR* at 2642.

[11] The GAF scale ranges from 1 to 100 and is divided into ten ranges of functioning. "The GAF rating is within a particular decile if *either* the symptom severity *or* the level of functioning falls within the range." *DSM-IV* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33. A GAF rating of 51 to 60 reflects "moderate" symptoms or functional impairments, such as "flat affect and circumstantial speech, occasional panic attacks . . . few friends, [or] conflicts with peers or co-workers." *Id.* at 34. A GAF rating of 31 to 40 reflects "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* For example, a depressed man who "avoids friends, neglects family, and is unable to work" would have a GAF rating in the 31-40 range. *Id.*

the initial assessment, the same score was listed on periodic treatment update forms, the last of which is dated September 19, 2007. (R. 116-20, 129, 206-09, 420-22, 661-62.) Dr. Sherry Zhang, plaintiff's psychiatrist, also assigned plaintiff a score of 45 in a Mental Impairment Questionnaire ("MIQ") dated April 5, 2006.  (R. 158-63) Plaintiff's treatment providers have often described her as "cooperative," "alert," "well-groomed," or "coherent" (*see, e.g.*, R. 456, 480, 491, 513, 681), while her mood was often "depressed," "tearful," or "labile" (R. 420-567, 661-82).[12] At times plaintiff has reported "flashbacks" of her experiences of abuse or visual hallucinations in the form of a "shadow." (R. 121, 445, 476, 480, 498, 509, 513, 681.) She has denied any suicidal or homicidal ideation throughout most of the course of her treatment. (*See* R. 420-567, 661-82; *but see* R. 476 (June 13, 2005, treatment note describing "off and on" suicidal ideation).)

Plaintiff also has a history of family stressors and interpersonal conflicts. In October 2004, plaintiff's niece, aged eight at the time, was molested by a man who was living with plaintiff's mother. (R. 499-500.) Following this incident, plaintiff reported increased flashbacks of her own molestation and increased stress, depression, anxiety, and insomnia. (R. 211, 201-02); (*see also, e.g.*, R. 193 (describing legal proceedings against stepfather).) Nevertheless, plaintiff responded "appropriately" to the incident by contacting the police. (R. 499-500.) Plaintiff also reported ongoing conflict with her family members, neighbors, and boyfriend. (*See, e.g.*, R. 451-53, 469, 471-72, 477-79, 482, 492, 496, 500, 677.) She has also occasionally been involved in verbal and physical altercations with strangers or secondary acquaintances. (R. 458, 546-47, 668.)

On November 23, 2004, following a review of plaintiff's treatment records, a state agency

---

[12] In psychiatry, "lability" refers to "emotional instability; rapidly changing emotions." *Dorland's Illustrated Medical Dictionary* 1008 (31st ed. 2007).

psychologist, Louis Poloni, Ph.D., completed a psychiatric review technique form and mental residual functional capacity ("RFC") assessment. The psychologist diagnosed plaintiff with MDD and PTSD and found that plaintiff had mild restriction in activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, and pace. (*See* ALJ Dec. 4; R. 142-57.) The psychologist noted that the record did not document any episodes of decompensation[13] and that plaintiff had never been hospitalized because of her mental impairments. (*See* ALJ Dec. 4; R. 142-57.) As to plaintiff's RFC, the psychologist noted that plaintiff had moderate limitations in maintaining attention and

_____

[13] "Episodes of decompensation" are defined in Social Security regulations as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 ("Appendix 1"), § 12.00(C)(4). Episodes of decompensation "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* Episodes of decompensation may also be inferred from "medical records showing significant alteration in medication," "documentation of the need for a more structured psychological support system" such as a group home or highly structured household, or "other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

Under the regulations, plaintiff would have been entitled to an automatic determination of disability if the ALJ had found that plaintiff (1) had an anxiety, affective, or personality disorder, such as PTSD, MDD, or BPD; and (2) had experienced "repeated episodes of decompensation, each of extended duration," and marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*See* ALJ Dec. 4); *see also* Appendix 1, §§ 12.04(B), 12.06(B), 12.08(B). The ALJ would also have been required to find plaintiff disabled if he had found that she (1) had a chronic affective disorder such as MDD that lasted over two years, was currently mitigated by medication or psychosocial support, and caused "more than a minimal limitation of ability to do basic work activities," *and* (2) suffered from "repeated episodes of decompensation, each of extended duration," a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [plaintiff] to decompensate," or a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *See* Appendix 1, § 12.04(C). "Repeated episodes of decompensation, each of extended duration" refers to "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* § 12.00(C)(4).

concentration for extended periods, remembering detailed instructions, interacting appropriately with the general public, accepting criticism from supervisors, and responding appropriately to changes in the work setting. (*See* ALJ Dec. 4; R. 142-57.)

On April 5, 2006, Dr. Zhang completed a medical source statement in which she stated that plaintiff has a moderate restriction in activities of daily living and marked limitations in maintaining social functioning and maintaining concentration, persistence, and pace. She stated that plaintiff had experienced three episodes of decompensation, but failed to provide any information regarding when or how the episodes occurred, and concluded that a minimal increase in mental demands would most likely cause her to decompensate. (*See* ALJ Dec. 4-5; R. 158-63.) Dr. Zhang completed another medical source statement on March 17, 2008, which made similar findings. (*See* ALJ Dec. 5.)

On June 11, 2007, another state agency psychologist, Roger Fretz, Ph.D., completed a psychiatric review form and mental RFC assessment after reviewing plaintiff's records. Dr. Fretz found that plaintiff had MDD, an anxiety disorder, and BPD. (*See* ALJ Dec. 5; R. 590-605.) Though he found that plaintiff had experienced one or two episodes of decompensation, his other findings and conclusions were similar to those of Dr. Poloni. (ALJ. Dec. 5; R. 590-605.) Dr. Fretz concluded that plaintiff had a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (ALJ. Dec. 5; R. 590-605.)  He also stated that plaintiff had moderately limited ability to maintain attention and concentration for extended periods and to respond appropriately to changes in work setting. (ALJ. Dec. 5; R. 590-605.)

**B. Orthopedic History**

Plaintiff suffers from lumbar disc disease at L4-5 and L5-S1. (ALJ Dec. 10.) Patrick

Murphy, D.O., performed a consultive evaluation of plaintiff on June 22, 2007, in which he stated that plaintiff was not capable of the full range of sedentary work and needed to sit or stand "at [her] option" because of chronic back pain. (*Id.*; R. 612 (Medical Source Statement by Dr. Murphy).) On June 29, 2007, a state agency consultant completed a physical RFC assessment, in which he stated that plaintiff could perform light work provided that it required only occasional postural activities. The state agency consultant stated that plaintiff's pain was controlled relatively effectively with medication and that plaintiff's statements regarding her daily activities were not consistent. (ALJ Dec. 10; R.616-22.)

On August 24, 2007, plaintiff underwent lumbar laminectomy at L4-5 and L5-S1. (ALJ Dec. 10; R.616-22.) Plaintiff continued to complain of back pain after that surgery and was subsequently diagnosed with epidural fibrosis at L4-5 and L5-S1 in addition to lumbar disc disease. (ALJ Dec. 10; R.616-22.) This diagnosis was confirmed by X-ray, MRI, and EMG imaging. (*Id.*) On February 15, 2008, plaintiff underwent spinal fusion surgery. (ALJ Dec. 10; R.616-22.) Plaintiff testified that she has used a cane since her August 2007 surgery. (ALJ Dec. 9; R. 698.) She also testified that she can usually sit for only fifteen minutes at a time before having to stand, that she can lift a gallon of milk with both hands by "hug[ging] it," that she needs assistance to unload a washing machine, and that she can walk for about five minutes before needing to rest. (*See* ALJ Dec. 9; R. 703-04).

**C. SSI Claims[14]**

Plaintiff filed the application that gives rise to this appeal on August 4, 2004, alleging disability due to MDD and PTSD beginning on August 31, 2003. Her application was initially

---

[14] Except where otherwise specified, the following facts are derived from the ALJ's decision dated June 17, 2008.

denied and a hearing took place before an ALJ on May 18, 2006. On July 5, 2006, the ALJ issued an unfavorable decision. Specifically, the ALJ found that (1) plaintiff had not engaged in substantial gainful activity since August 31, 2004; (2) plaintiff had MDD with psychotic features and PTSD, both of which were "severe" within the meaning of Social Security regulations; (3) plaintiff's impairments did not meet the listed requirements in 20 C.F.R. Part 404, Subpart. P, Appendix 1 ("Appendix 1"); (4) plaintiff was able to perform "work consisting of simple, routine tasks not requiring more than occasional contact with supervisors and co-workers and requiring no contact with the public; and (5) there were jobs that existed in the national economy that plaintiff could perform.

The Appeals Council denied plaintiff's request for review on September 19, 2006, and plaintiff appealed to this court on October 24, 2006. I referred the matter to a magistrate judge, who concluded on August 15, 2007, that the ALJ erred by (1) failing to address GAF scores assigned to plaintiff by her mental-health treatment providers and (2) failing to include all of plaintiff's mental limitations in a hypothetical question to the VE. Neither party objected, and I approved and adopted the R&R and remanded the matter to the Commissioner on September 11, 2007, for further decision making consistent with the R&R. *See* Order, *Cruz v. Astrue*, No. 06-4644 (E.D. Pa. Sept. 11, 2007).

While her appeal of the first application was pending before this court, plaintiff filed a second SSI application on March 22, 2007, alleging that she was disabled by depression, "split personality," anxiety, and back pain from a herniated disk. (R&R 5.) As in her first application, plaintiff alleged that she was disabled as of August 31, 2003. (*Id*.) The application was initially denied and plaintiff requested a hearing.

When her first claim returned to the Commissioner on remand, plaintiff's two claims

were consolidated. An ALJ conducted another hearing on April 30, 2008. The ALJ heard testimony from plaintiff and from a new VE, and received updated orthopedic and psychiatric records from plaintiff's attorney. The ALJ issued an unfavorable decision on June 17, 2008. Specifically, the ALJ found that (1) plaintiff had not engaged in substantial gainful activity since August 4, 2004 (the application date); (2) plaintiff had MDD with psychotic features, PTSD, and BPD, all of which were "severe" within the meaning of Social Security regulations, and also had a severe lower- back impairment beginning in January 2007; (3) plaintiff's impairments did not meet the listed requirements in Appendix 1; (4) before January 2007, plaintiff was able to perform work consisting of "simple, routine tasks due to a moderate . . . limitation in concentration, persistence, and pace," with "not more than occasional contact with supervisors and fellow employees, and no contact with the public," and subject to a "moderate . . . limitation in maintaining concentration for extended periods of time" and a "moderate . . . limitation in responding to changes in a work setting"; (5) after January 2007, plaintiff was able to perform work subject to the same mental limitations as before but with additional exertional limitations, including limitations in lifting, sitting and standing, various postural and environmental restrictions, and a "sit/stand option"; and (6) there were jobs that existed in the national economy that plaintiff could perform both before and after January 2007. The ALJ based his determination that plaintiff could perform jobs in the national economy on the VE's responses to the ALJ's questions concerning a hypothetical individual with plaintiff's RFC.

The Appeals Council denied review, and plaintiff appealed again to this court on February 11, 2009. I referred the matter to a magistrate judge, who recommended on March 31, 2010, that I affirm the decision of the Commissioner. Plaintiff has objected to the R&R.

**II. Legal Standard**

**A. Standard of Review**

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects. 28 U.S.C. § 636(b)(1) (2006). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.*

In contrast, the district court may review the ALJ's final decision only to determine "whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). This standard of review is deferential. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360.

In making this determination, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour*, 806 F.2d at 1190. "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Before a district court can review the record to determine if the Commissioner's final decision is supported by substantial evidence, the Commissioner must provide an explanation for

his or her findings in order to allow for meaningful judicial review. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000) (holding that an ALJ must "set forth the reasons for his decision"). The ALJ cannot simply state a conclusion "without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Id.* The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119. Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of [the] reasoning supporting" those conclusions. *Id.* at 120.

**B. Standard for Disability Determination**

SSI is available to persons who are aged, blind, or disabled. 42 U.S.C. § 1382(a) (2006). A person is disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* § 1382c(a)(3)(A). The impairment or combination of impairments must render the claimant unable either to return to his previous work or, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382(a)(3)(B).

When evaluating a claim for disability benefits, the Commissioner applies a five-step sequential analysis: (1) whether the claimant worked during the alleged period of disability, (2)

whether the claimant has a "severe medically determinable physical or mental impairment," (3) whether the impairment meets the requirements of a "listed impairment" found in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) whether the claimant can continue to perform "past relevant work," and (5) whether the claimant can perform "other work" in the national economy. 20 C.F.R. § 416.920(a)(4) (2008); *See also Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). The claimant bears the burden of proof at steps one, two, and four.[15] If the claimant satisfies these requirements, the burden of production shifts to the Commissioner to show that the claimant is capable of performing other work available in the national economy. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

If the claimant's impairment does not meet or equal a listed impairment, the Commissioner must assess at step four the claimant's RFC, a measure of what the claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 416.920(e), 416.945(a)(1). The RFC is an "assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," equivalent to eight hours per day, five days per week. Soc. Sec. Admin., Policy Interpretation Ruling ("S.S.R.") No. 96-8p (1996); *see also* 20 C.F.R. § 416.945(b), (c). In assessing the claimant's functional restrictions, the ALJ must consider the combined effect of all of a claimant's medically determinable impairments. 20 C.F.R. § 416.945(a)(2); *see also Burnett*, 220 F.3d at 122. The ALJ must identify the individual's restrictions and abilities on a "function-by-function basis," including (1) physical activities such as "sitting, standing, walking, lifting,

---

[15] Technically, neither party bears the burden of proving step three because "step three involves a conclusive presumption based on the listings." *Sykes*, 228 F.3d at 263 n.2. *But see Montgomery v. Comm'r of Soc. Sec.*, No. 07-4500, 2009 U.S. Dist. LEXIS 54976, at *10-12 n.3 (D.N.J. Mar. 5, 2009) (reasoning that dicta in *Sykes* misinterprets Supreme Court precedent and holding that the claimant actually bears the burden of proof at step three).

carrying, pushing, pulling, or other physical functions"; (2) mental activities such as "understanding, remembering, and carrying out instructions, and . . . responding appropriately to supervision, coworkers, and work pressures in a work setting"; and (3) any applicable restrictions on the individual's work environment. S.S.R. No. 96-8p; 20 C.F.R. § 416.945(b), (c), (d). The ALJ must consider "all of the relevant medical and other evidence" in determining the extent of the individual's functional limitations. 20 C.F.R. § 416.945(a)(3).

After calculating the claimant's RFC, the ALJ compares the claimant's RFC to the requirements of the claimant's past jobs in order to determine whether the claimant can return to that previous work. If not, the ALJ moves on to step five, at which point he considers the claimant's RFC, physical ability, age, education, and work experience in order to determine whether the claimant can perform any other "substantial gainful work that exists in the national economy." *Id.* § 416.920(g).

**III. Discussion**

Plaintiff objects that the ALJ (1) failed to specify in his question to the VE how often plaintiff needed to alternate between sitting and standing and (2) improperly discounted the GAF scores of 45-50 that her mental-health treatment providers assigned to her. (Pl.'s Obj. to Report & Recommendation of Magistrate Judge ("Pl.'s Obj.").)

I conclude that any error the ALJ may have committed in failing to specify how often plaintiff needed to alternate between sitting and standing was harmless because the VE stated that at least some jobs she identified could be performed either sitting or standing and that plaintiff would therefore be able to sit or stand at will. Also, the ALJ's decision to reject the findings of plaintiff's mental-health treatment providers regarding her GAF scores was supported by substantial evidence. The GAF scores were inconsistent with the record as a whole, which the

ALJ found to demonstrate moderate, rather than severe, functional limitation. As a result, I will approve and adopt the magistrate judge's recommendation that I affirm the decision of the Commissioner.

### A. Sit/Stand Option

Plaintiff objects that the ALJ, in his question to the VE regarding plaintiff's ability to work despite her orthopedic limitations, failed to specify how often plaintiff was required to alternate between sitting and standing. Plaintiff argues that this failure violated S.S.R. No. 96-9p, which states that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." S.S.R. No. 96-9p. I agree with the magistrate judge's conclusion that the VE's testimony satisfied the requirements of S.S.R. No. 96-9p because at least one of the jobs the VE identified could be performed either sitting or standing, which would permit plaintiff to sit or stand at will.

The ALJ found that, since January 2007, plaintiff retained the ability to sit for eight hours in an eight-hour work day "with a sit/stand option." (ALJ Dec. 8.) In arriving at this limitation, the ALJ relied on plaintiff's testimony that she was usually able to sit for fifteen minutes at a time before having to stand and on Dr. Murphy's statement that plaintiff required a sit/stand option. (*Id.* at 9-10.) The ALJ found that plaintiff's overall testimony regarding her limitations was "fairly credible" except insofar as it was unsupported by the record or inconsistent with the ALJ's ultimate RFC determination. (ALJ Dec. 9.) Dr. Murphy's opinion, which the ALJ accepted, supported plaintiff's testimony by confirming that plaintiff needed to be able to sit or stand "at [her] option." (*Id.* at 10; R. 612 (Medical Source Statement by Dr. Murphy).) Moreover,

the ALJ's finding that plaintiff required a "sit/stand option" was consistent with plaintiff's statement that she needed to stand every fifteen minutes or so. The ALJ thus implicitly accepted plaintiff's testimony that she could usually sit only for fifteen minutes at a time before having to stand.

The ALJ found, however, that there were jobs in the national economy that plaintiff could perform. In so finding, the ALJ relied on the VE's response to a hypothetical question about an individual who, in addition to various other physical and mental limitations, could "stand and walk one hour or less, but could sit for eight hours, but requires a sit or stand option." (R. 710.) The VE responded that the individual could work as an unskilled sedentary inspector, could work as a "preparer" doing "sedentary unskilled production work," could work as a lens inserter, and could perform "other types of inspection work" such as "table worker." (R. 711-12.) On cross-examination, the VE testified that two of the inspection jobs, which involve inserting a piece of paper or a length of surgical suturing thread into a measuring device, could be performed either sitting or standing because the measuring device would remain within the employee's reach despite the change in height that accompanies a transition between a seated and standing position. (R. 717-19.) The VE further stated that the jobs did not need to be performed at a constant or continuous pace. (R. 719.)

The magistrate judge concluded that the ALJ properly relied on the VE's testimony because the VE had effectively "conveyed that, even if the hypothetical claimant had a need to change positions frequently and at-will or to stand for some period of time even when not on breaks, those needs could be accommodated." (R&R 12.) Plaintiff objects that the VE's testimony "means only that the job accommodates the need for a sit-stand option" and "cannot be read to support a finding that an individual who can only sit for no more than 15 minutes at a

time and who needs to alternate constantly between sitting and standing throughout the day to relieve persistent low back pain can perform the gauger position or the other jobs identified by the VE." (Pl.'s Obj. 8.)

I agree with the magistrate judge. Because the inspection jobs could be performed either sitting or standing, plaintiff would not be required to take a break every time she needed to stand but instead could simply change position and continue working. As a result, even if the ALJ violated S.S.R. No. 96-9p by failing to specify how often the plaintiff would need to exercise her sit-stand option, any such error was harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (declining to remand a claim to the Commissioner, despite the ALJ's failure to address the effects of plaintiff's obesity explicitly, because remand "would not affect the outcome of the case"); *see also Hodge v. Barnhart*, 76 F. App'x 797, 800 (9th Cir. 2003) ("Even if the ALJ was required to state the frequency that Hodge needed to alternate between sitting and standing, any error was harmless because the VE stated that all the jobs that he identified for Hodge included 'the option to sit or stand' at any time."); *Nesbitt v. Barnhart*, No. 03-C-8308, 2004 U.S. Dist. LEXIS 18522, at *19-20 (N.D. Ill. Sept. 13, 2004) (holding that, where the vocational expert interpreted a "sit/stand option" as permitting a claimant to sit or stand "as often as he would like and for however long he would like," there was no need for the ALJ to specify the frequency and duration of the claimant's need to sit or stand).

The cases that plaintiff cites are not in conflict with my conclusion. In none of those cases did the VE explicitly state that the claimant could perform a job in either a sitting or standing position and would therefore not be required to take a break each time he or she needed to stand. *See Maynard v. Astrue*, 276 F. App'x 726, 731 (10th Cir. 2007); *Matthews v. Astrue*, No. 09-cv-00051-LTB, 2009 WL 3158169, at *6-7 (D. Colo. Sept. 24, 2009); *Harris v. Astrue*, No.

4:08cv280-SPM/WCS, 2009 WL 115740, at * 9-10 (N.D. Fla. Apr. 27, 2009; *Wasilauskis v. Astrue*, No. 08-284-B-W, 2009 WL 861492, at *5 (D. Me. Mar. 30, 2009); *Patterson v. Comm'r of Soc. Sec. Admin.*, No. CV-08-0533-PHX-ROS, 2009 WL 414044, at *2-3 (D. Ariz. Feb. 19, 2009). Plaintiff's cases can therefore be distinguished from this one insofar as it was actually impossible in those cases, absent a specific finding on the issue by the ALJ, to determine whether any given job could accommodate the worker's need to stand as frequently as he or she needed to. Only one of the cases that plaintiff cites suggested that even a restriction requiring that a claimant have "the option to alternate between sitting and standing at will" would be insufficiently specific to meet the requirements of S.S.R. No. 96-9p. *See Matthews*, 2009 WL 3158169, at *7. I decline to follow that decision, which was by a district court outside this circuit, to the extent that it conflicts with the Third Circuit's holding in *Rutherford v. Barnhart* that remand is appropriate only when there is a possibility that requiring the ALJ to discuss an issue more explicitly could lead to another outcome. *See* 399 F.3d at 553.

Because plaintiff did not suffer any prejudice as a result of the ALJ's failure to make specific findings as to how often plaintiff would be required to alternate between sitting and standing, I will overrule plaintiff's objection as to that issue and will approve and adopt the relevant portion of the R&R.

**B. GAF Scores**

Plaintiff objects to the ALJ's finding that "the medical record does not support a conclusion that the claimant's mental limitations are of the level of severity reflected by scores of 45 to 50." (Pl.'s Obj. 8; ALJ Dec. 6.) Plaintiff argues that the ALJ selectively focused on isolated mental-health treatment records describing plaintiff as being in a good mood while ignoring other records that support the GAF scores assigned to her, including repeated references to plaintiff's

depression and mood instability. (Pl.'s Obj. 11.) Plaintiff also argues that the ALJ improperly rejected the opinions of plaintiff's treating physicians on the basis of his own lay assessment of plaintiff's medical records and daily activities. (*Id*. at 13.) Finally, plaintiff argues that her GAF scores "'constituted a specific medical finding' that [she] was unable to perform competitive work." *(Id*. at 14 (citing *Escardille v. Barnhart*, No. 02-2930, 2003 WL 2149999, at *6-7 (E.D. Pa. June 24, 2003).) Plaintiff notes that Dr. Zhang concluded that she had "marked difficulty in social functioning and ability to assume increased mental demands associated with competitive work" in a Treating Source Opinion on March 17, 2008, which listed similar limitations as those included in Dr. Zhang's MIQ dated April 5, 2006. (*Id*. at 15.)

As the magistrate judge stated in his 2007 report, GAF scores constitute "'medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability.'" *Cruz*, No. 06-4644, slip op. at 9 (E.D. Pa. Aug. 15, 2007) (quoting *Robleto v. Barnhart*, No. 05-4853, 2006 WL 2818431, at *8 (E.D. Pa. Sept. 28, 2006)). "An ALJ who has failed to specifically address a claimant's GAF score or who has discounted the score without providing reasons has thus committed reversible error and his decision must be remanded for further consideration." *Id.* at 10. Moreover, GAF scores cannot be "ignored by the ALJ, even where the individual impairments suggested by the scores are discussed." *Id.*

The ALJ's 2006 determination that plaintiff was not disabled was deficient because the ALJ had failed to mention plaintiff's GAF scores of 45-50. *See Cruz*, No. 06-4644, slip op. at 10. The magistrate judge noted that the ALJ "did provide an examination of the specific impairments that would be reflected in a GAF score in the 45-50 range" and concluded that although "the ALJ did address in a meaningful way plaintiff's mental impairments," failure to properly discuss the

score itself was erroneous. As a result, the magistrate judge recommended remand. Neither party objected, and I adopted the magistrate judge's recommendation and remanded the matter to the Commissioner.

On remand, the ALJ discussed plaintiff's GAF scores but assigned them little weight, finding that they were unsupported by the medical evidence in the record, plaintiff's activities, and plaintiff's testimony:

> The medical record does not support a conclusion that the claimant's mental limitations are of the level of severity reflected by scores of 45 to 50 on the GAF scale. The claimant has been repeatedly described in treatment notes as alert, well-groomed, coherent, and cooperative. . . . At times, the claimant has been described as stressed, tearful, or irritable, as well as being calm, in a good mood, and happy. There is no evidence of sudden mood swings. . . . Lastly, a GAF score of 45 to 50 is inconsistent with the claimant's testimony that she has been raising her niece, who receives supplemental security income benefits for a mental impairment . . . .

(ALJ Dec. 6 (internal record citations omitted).)

As plaintiff argues, the record does not support the ALJ's finding that there is no evidence of sudden mood swings. Plaintiff's treatment providers at Crozer CBHS listed her problem as "mood instability" on numerous occasions. (R. 420-567, 661-82.) The ALJ did not adequately acknowledge treatment notes in the record describing plaintiff as labile. A GAF score of 45-50, however, indicates that an individual suffers from *either* "serious symptoms" *or* "serious limitations in functioning." *See DSM-IV* at 34. This means that the presence of a serious psychiatric symptom does not necessarily require a finding that plaintiff has serious work-related impairments as well. (R&R 15.) A GAF score of 45-50 also does not necessarily reflect that the psychiatrist believed that the patient had severe functional or occupational limits (*Id.*) Therefore, I agree with the magistrate judge that "notwithstanding the serious symptoms that [plaintiff] may have exhibited relative to her mental impairments," such as mood instability, "those symptoms did not necessarily give rise to 'serious impairments in social or occupational functioning.'" (*Id.*)

I conclude that there is sufficient basis in the record to support the ALJ's conclusion that the plaintiff's occupational limitations are not as severe as reflected in the score of 45-50.

Plaintiff has raised her niece, who receives SSI benefits for psychological impairment, since birth. (*See* R. 698-701, 241 (hearing testimony).) Plaintiff maintains their apartment and performs normal chores daily. (ALJ Dec. 9; R. 298 (hearing testimony).) She was never hospitalized for any mental conditions. (ALJ Dec. 9.) Plaintiff maintains some social interaction with a friend outside the home. (R. 299 (hearing testimony).) Dr. Zhang's treatment notes show that plaintiff always remembered to attend her appointments or call to cancel. (*Id.* at 320.) Treatment records also show that plaintiff was consistently "well-groomed, coherent, and cooperative" even on days when the notes also describe her as depressed or labile. (*See, e.g.*, R. 456, 480, 491, 513, 681.)

Contrary to plaintiff's argument, her daily activities constitute more than mere sporadic or transitory activity. "It is well established that sporadic or transitory activity does not disprove disability." *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1980) (finding that full use of limbs, shopping for necessities, and two day-long hunting trips amounts only to sporadic activity). But caring for a young child and doing housework daily is not sporadic activity. *See Harodenski v. Comm'r of Soc. Sec.*, 215 F. App'x. 183, 189 n. 5 (3d Cir. 2007) (non- precedential) ("[W]e disagree that house work and child care- which Harodenski claimed to have been performing daily- constitute 'sporadic and transitory activities.'"); *Lozada v. Barnhart,* 331 F. Supp. 2d 325, 338 n.21 (E.D. Pa. 2004) ("Caring for two young children and maintaining her home on a daily basis can hardly be described as sporadic activity."); *Castillo-Borrero v. Barnhart,* No. Civ. A. 02-588, 2004 WL 2203744, at *6 (E.D. Pa. Sept. 27, 2004) (maintaining home and caring for three young children on daily basis is not sporadic or transitory activity). Plaintiff cares for her

young niece, who herself suffers from a psychological impairment.[16] Plaintiff is also primarily responsible for maintaining their apartment on a daily basis. The ALJ properly relied on these facts within the record to reach his conclusion.

By considering these facts, the ALJ did not interject his lay opinion but weighed the evidence found in the record as whole. "In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Id.* at 319.

Unlike in *Morales*, here, the ALJ did not discount the medical experts' opinions solely on the basis of his own credibility judgments and observations of the medical records. *See id.* at 318-19 (remanding because ALJ rejected medical opinions on basis of notes describing plaintiff as malingering, manipulative, and stable with medication); *see also Jackson v. Astrue*, No. 3:08-220, 2010 U.S. Dist. LEXIS 31593 at *34-35 (W.D. Pa. March 31, 2010) (finding ALJ's rejection of GAF score unsupported by substantial evidence because based only on subjectivity of GAF score, doctor's reliance on self-reported symptoms, lack of psychological evaluation when GAF assigned, and lack of hospital treatment). The ALJ weighed Dr. Zhang's specific conclusions, including that plaintiff suffers from marked impairment in social functioning and

---

[16] Plaintiff objects to the ALJ's reliance on the fact that plaintiff raises her niece because "records show that the niece served as a significant stressor for plaintiff." (Pl.'s Obj. 11.) Her psychiatric records indeed demonstrate that raising her niece has been a source of stress for plaintiff, especially when her niece was molested. The record also shows, however, that plaintiff was able to handle the incident appropriately by calling the proper authorities. (R. 499-500.) Her GAF score remained consistent, and the incident did not cause decompensation.

moderate restriction in ability to perform normal activities of daily living, against plaintiff's reported activities. The ALJ concluded that based on psychiatric treatment notes and plaintiff's own account of her daily activities, plaintiff did not suffer severe limitations in social functioning and daily living as may be reflected in a GAF score of 45-50. The ALJ's conclusion was supported by contrary medical evidence provided by two psychological experts from the Pennsylvania state agency. Both Dr. Poloni and Dr. Fretz found that plaintiff has only mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and moderately limited ability to maintain attention and concentration for extended periods and to respond appropriately to changes in work setting. (*See* ALJ. Dec. 4-5; R. 142-57, 590-605.)

Lastly, Dr. Zhang's 2006 MIQ and 2008 Treating Source Opinion do not establish that plaintiff's GAF scores reflect serious functional or occupational impairments. I approved and adopted the magistrate judge's conclusion in the 2007 R&R that the ALJ properly discounted Dr. Zhang's findings in the MIQ because "'[t]here is no indication anywhere in the record that claimant has such extreme limitations as reported by her treating psychiatrist.'" *Cruz*, No. 06-4644, slip op. at 14 (E.D. Pa. Aug. 15, 2007). The ALJ provided specific examples supporting his conclusion, which demonstrate that Dr. Zhang's opinions in the MIQ were inconsistent with plaintiff's treatment notes,[17] other evidence in the record,[18] and the more persuasive report

---

[17] For instance, in the MIQ, Dr. Zhang indicated that plaintiff had three episodes of decompensation, but there was no evidence of this in the record. *Cruz*, No. 06-4644, slip op. at 13.

[18] For instance, "[i]n contrast to Dr. Zhang's finding that plaintiff was moderately restricted in her ability to perform the normal activities of daily living, the ALJ found that 'the claimant lives in an apartment with other people and that she is the one who primarily maintains the apartment.'" *Id.* at 14.

submitted by Dr. Poloni.[19] *Id*. at 13-15. Thus, I concluded that the ALJ's decision to afford little weight to Dr. Zhang's opinions regarding work limitations was supported by sufficient evidence. *Id.* at 14.

On remand, the ALJ adopted and incorporated his prior opinion. The ALJ then also rejected the 2008 Treating Source Opinion. (ALJ Dec. 5.) In her 2008 report, Dr. Zhang noted that plaintiff had repeated instances of decompensation and suffered from a residual disease process whereby any minimal increase in mental demands would be predicted to cause decompensation. (*Id*.) Dr. Zhang failed to provide explanations for her findings or point to any evidence in her treatment notes demonstrating that decompensation ever occurred. (*Id*.) Again, the ALJ concluded that Dr. Zhang "placed Cruz's limitations at a 'far greater level of severity than documented in the record." (R&R 18.) Despite relying on Dr. Zhang's reports as support for the GAF scores, plaintiff did not object to the magistrate judge's recommendation that "it was not improper for the ALJ to discount the extent of limitations in light of the deficiencies contained in both her 2006 and 2008 reports." (R&R 21.)

Dr. Zhang's 2006 and 2008 reports not only fail to provide support for the GAF scores, but further undermine them. A GAF score is a physician's subjective assessment of an individual's level of functioning. Dr. Zhang's findings and conclusions, which would provide the basis for the scores she assigned, have already been properly rejected. The ALJ found that Dr. Zhang's opinions consistently indicated that plaintiff's limitations were more severe than otherwise established by evidence in the record. This includes the GAF scores assigned by Dr. Zhang. Therefore, I conclude that there is sufficient evidence to support the ALJ's conclusion

---

[19] "In reviewing inconsistencies between these reports, the ALJ found that Dr. Poloni's opinion was based upon objective medical evidence while Dr. Zhang's was in conflict with medical evidence on the record as well as her own treatment notes." *Id*. at 15.

that plaintiff's occupational impairments are not as severe as those reflected by GAF scores of 45-50.

**IV. Conclusion**

For the above reasons, I will overrule both of plaintiff's objections to the magistrate judge's Report and Recommendation. The ALJ's decision is supported by substantial evidence, and consequently, I will affirm the Commissioner's decision. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| YVETTE CRUZ, | : | |
|    Plaintiff, | : | CIVIL ACTION |
| | : | |
|    v. | : | NO. 09-0508 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
|    Defendant. | : | |
| | : | |

**Order**

YOHN, J.

    **AND NOW**, this __ day of September, 2010, upon consideration of plaintiff's Request for Review and the Commissioner's Response, and after careful and independent review of the magistrate judge's Report and Recommendation (Docket No. 15), plaintiff's objections thereto, and the Commissioner's response to those objections, it is hereby **ORDERED** that:

    1. Plaintiff's objections are **OVERRULED**.

    2. The Report and Recommendation of United States Magistrate Judge David R. Strawbridge is **APPROVED and ADOPTED**.

    3. Plaintiff's motion for summary judgment or, in the alternative, motion for remand is **DENIED**.

    4. Judgment is entered affirming the decision of the Commissioner.

_____
William H. Yohn Jr., Judge